FILED

04/13/2017

Clerk of the
Appellate Courts



# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
March 22, 2017 Session

## BRANDI BURGE, ET AL. v. FARMERS MUTUAL OF TENNESSEE

**Direct Appeal from the Circuit Court for Grundy County**
**No. 8650     Justin C. Angel, Judge**

---

### No. M2016-01604-COA-R3-CV

---

This appeal involves an insurer's refusal to pay a claim for a fire loss. The trial court granted summary judgment in favor of the plaintiffs on the issue of liability and held a bench trial on the issue of damages only. The trial court ultimately awarded the plaintiffs $127,500 for their covered losses, prejudgment interest, and a statutory penalty because the insurer's refusal to pay the claim was not in good faith. On appeal, the insurer argues that the plaintiffs are not entitled to any recovery because they failed to sufficiently prove their damages. The insurer also contends that it did not act in bad faith because it had substantial legal grounds for denying the claim. The plaintiffs argue that the trial court should have awarded additional damages. We conclude that the trial court should have awarded $4,000 in additional damages for the loss of the residence but otherwise affirm the trial court's judgment as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Christopher Dunn Heagerty, Knoxville, Tennessee, for the appellant, Farmers Mutual of Tennessee.

Russell Anne Swafford, Dunlap, Tennessee, for the appellees, Brandi Burge, Daniel Layne, and Sharon Layne.

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Brandi Burge resided in a mobile home in Grundy County with her husband and five children. Mrs. Burge's parents purchased the mobile home from a mobile home dealer in 2008, when it was newly manufactured, and sited the home on their family farm for Mrs. Burge and her family. On July 10, 2013, the mobile home caught fire. The local fire department responded and attempted to extinguish the fire, but it reignited and eventually burned the home to the ground. No walls remained standing, and nothing was salvageable. The only thing saved during the fire was one basket of laundry.

Mrs. Burge maintained a mobile homeowner's insurance policy with Farmers Mutual of Tennessee ("Insurer"). The policy provided coverage for direct physical loss or damage to the mobile home and her personal property because of fire. As co-owners of the mobile home, Mrs. Burge's parents, Sharon and Daniel Layne, were listed as additional insureds on the policy.

The day after the fire, Sharon Layne contacted their local insurance agency to report the fire. Mrs. Burge and Mrs. Layne maintained contact with their local agency and Insurer over the next few months, submitting numerous documents and participating in an examination under oath as requested by Insurer. Mrs. Burge and her family could not afford to rent another home while continuing to pay the promissory note on their burned mobile home. As a result, the Burge family moved into the home of Mr. and Mrs. Layne, intending to stay until the matter was settled.

In August 2013, Insurer granted Mrs. Layne's request for a $2,000 "advance" on the personal property claim in order to purchase school clothing for the children. Aside from that payment, however, Insurer failed to meet the demands for payment under the policy without any response or explanation as to why it failed or refused to pay.

On July 7, 2014, almost one year after the fire occurred, Mrs. Burge and Mr. and Mrs. Layne (collectively "Plaintiffs") jointly filed this lawsuit against Insurer. They sought to recover $69,000 for the "face amount" of the policy coverage for the residence, $34,500 as the limit on coverage for personal property (minus $2,000 for the advanced payment for school clothing), and $13,800 for additional living expenses, in addition to prejudgment interest, attorney's fees, and the statutory "bad faith penalty" set forth at Tennessee Code Annotated section 56-7-105.

In its answer, Insurer admitted that Plaintiffs sustained a fire loss to their mobile home and its contents on July 10, 2013. It admitted that the home and contents were covered by a casualty insurance policy provided by Insurer. It also acknowledged receiving Plaintiffs' demand for payment pursuant to the policy. However, Insurer claimed that it had "significant legal grounds for failing to pay" the claim. Specifically, Insurer asserted that "Plaintiffs made material misrepresentations in their application for insurance" in 2008. Insurer did not specify what type of misrepresentation was allegedly made but suggested that the policy was subject to being declared void *ab initio* and that Plaintiffs were not entitled to any recovery under the policy.

The circuit court judge retired shortly after Insurer's answer was filed, effective September 1, 2014, and the case was transferred to a new circuit judge in July 2015. In the meantime, in November 2014, Plaintiffs propounded discovery requests to Insurer, and Insurer failed to respond to the discovery for a period of six months. After a motion to compel and subsequent order were filed with the court, Insurer finally responded in May 2015. At that time, it disclosed, for the first time, that it denied the existence of coverage for Plaintiffs' claim based on an alleged failure to disclose on the application for insurance the existence of "multiple mortgages on the property."

In August 2015, Plaintiffs filed a motion for summary judgment, asserting that no genuine issue of material fact existed with regard to Insurer's defense regarding the existence of multiple mortgages. Plaintiffs submitted affidavits and exhibits in an attempt to demonstrate that the mobile home was only encumbered by one mortgage. Insurer filed a response and asked the court to enter summary judgment in its favor. Insurer insisted that "the insured property was encumbered by two (2) mortgages at the time the application for insurance was submitted" and that "Plaintiffs did not disclose both mortgages to [Insurer] in their application."

On April 18, 2016, the trial court entered an order granting summary judgment to Plaintiffs and denying Insurer's request for summary judgment. The trial court found that there was only one lien holder on the mobile home and that the bank that held that lien was specifically listed on the Plaintiffs' insurance application. Therefore, the court held, "there was no misrepresentation or failure to disclose by Plaintiff[s] to Defendant" in the application for insurance.

On May 19, 2016, a bench trial was held on the issue of damages. The only witnesses to testify were Plaintiffs (Mrs. Burge and Mr. and Mrs. Layne) and their real estate valuation expert. Insurer cross-examined three of Plaintiffs' witnesses but

3

presented no witnesses of its own. The trial court found that Plaintiffs and their expert were all credible witnesses. It found that Plaintiffs had cooperated with Insurer "throughout this process" and fulfilled all of their obligations. Ultimately, the trial court awarded Plaintiffs $65,000 for the value of the residence at the time of the fire, which was less than the coverage limit of $69,000 that Plaintiffs sought to recover. The trial court awarded Plaintiffs $34,500 for the loss of personal property, which was the policy limit they requested. The court awarded $2,500 for additional living expenses (minus the $2,000 advance already paid), which was also less than the policy limit of $13,800 that Plaintiffs sought to recover for additional living expenses. The trial court awarded prejudgment interest at the rate of ten percent and imposed a statutory bad faith penalty of fifteen percent, noting Insurer's delays, its failure to pursue its claimed defense in an efficient manner, and the "harsh and rude treatment" Plaintiffs received from Insurer's adjuster and company representative when they sought information from him. All things considered, Plaintiffs were awarded a total judgment of $127,500. Insurer timely filed a notice of appeal.

## II. ISSUES PRESENTED

Insurer presents the following issues for review, as slightly reworded, on appeal:

1. Whether the trial court erred in entering judgment for Plaintiffs for the loss sustained to the mobile home when there was no competent proof to support such an award.

2. Whether the trial court erred in entering judgment for Plaintiffs on their personal property claim when there was no actual proof of the amount and value of their personal property loss.

3. Whether the trial court erred in granting Plaintiffs recovery under Tennessee Code Annotated section 56-7-105, when there were substantial legal reasons supporting Insurer's decision to dispute liability for the claim.

In their posture as appellees, Plaintiffs present the following additional issues, as slightly reworded, for review:

4. Whether the trial court should have awarded the policy limit of $69,000 for loss of the mobile home, rather than $65,000.

5. Whether the trial court should have awarded the policy limit of

4

$13,800 for additional living expenses, rather than the net award of $500.

6.      Whether the trial court should have awarded the statutory maximum of twenty-five percent for the statutory bad faith penalty, rather than fifteen percent.

For the following reasons, we affirm the decision of the circuit court as modified and remand for further proceedings.

## III. STANDARD OF REVIEW

A trial court's findings of fact from a bench trial are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *In re Estate of Ledford*, 419 S.W.3d 269, 277 (Tenn. Ct. App. 2013). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citation omitted). Appellate courts afford trial courts considerable deference when reviewing issues that hinge on the credibility of the witnesses because trial courts are uniquely positioned to observe the witnesses' demeanor and conduct. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). We review the trial court's resolution of legal questions *de novo* with no presumption of correctness. *Id*.

## IV.    DISCUSSION

### A.    Valuation of the Residence

We begin with Insurer's issue regarding whether the trial court erred in entering a judgment for Plaintiffs for the loss of the mobile home because "there was no competent proof to support such an award." Plaintiffs argue that they presented sufficient evidence and that the trial court should have awarded the policy limit of $69,000 for the value of the mobile home rather than its award of $65,000.

The mobile home was purchased in 2008 and was a 2009 model doublewide home. The total purchase price on the bill of sale was $68,397.74. Mrs. Burge testified that she and her husband made yearly improvements to the home, including the addition of large front and back porches, an additional bedroom, updated light fixtures, ceiling fans, hardwood floors, a closet, a built-in desk, and an archway leading into the living room. She testified that the home had five bedrooms and two bathrooms. Mrs. Burge estimated that the total value of the home as of the date of the fire in 2013 was at least

$73,000.

Mrs. Layne testified that she visited the home often and that it was in excellent condition, well-maintained, and constantly upgraded by the Burge family. She estimated that the cost of the porches alone exceeded $10,000. Mrs. Layne estimated that the value of the mobile home was over $75,000 at the time of the fire due to the many improvements made by the Burges.

Plaintiffs also called an expert witness, George Hamilton, to testify at trial regarding the value of the mobile home. Mr. Hamilton owned a land and auction company. He had been a licensed real estate broker and licensed auctioneer for the past 33 years. Mr. Hamilton also served on the board of directors at a bank, where he marketed bank-owned properties and consulted with the bank on market values for properties for purposes of loans. His practice area included eight counties, including Grundy County. Mr. Hamilton also owned properties and had developments located in Grundy County. He had served as a special master on numerous occasions to determine market values of properties in various contexts. His business had sold eighteen mobile homes in 2015, the year before trial.

Although Mr. Hamilton was unable to personally inspect the mobile home at issue due to its destruction by fire, he testified that he had reviewed information and documents about Plaintiffs' mobile home and relied on his experience selling mobile homes and properties in the area. He reviewed a "State of Tennessee Real Estate Appraisal Card" ("Tax Card") for the property's past appraisal, which was dated February 27, 2013. Mr. Hamilton reviewed pictures of the home, its measurements, and information regarding its improvements. Based on the Tax Card, Mr. Hamilton testified that this mobile home contained 2,280 square feet. The Tax Card listed a "Depreciated Value" of $84,348 for the mobile home. Mr. Hamilton also reviewed the records from the bank that financed the original loan in 2008 and refinanced the home in 2013, prior to the fire. Those records contained a document entitled "NADA Appraisal Guides," dated May 7, 2013, two months prior to the fire, which estimated the "Total Adjusted (Retail) Value" of the mobile home at $70,275. Mr. Hamilton testified that he did not "do any comps on listing prices for properties such as this one" because "[i]t wasn't available." However, he said he relied on his knowledge of actual sales that his company had previously completed in Grundy County.

After describing all the information he reviewed, Mr. Hamilton stated his conclusion as follows:

Q. Based on that do you have an expert opinion of the value of this mobile home at the time of loss in July 2013?

6

A. Yes, ma'am. I do.
Q. What is that?
A. Would you like one hard figure or somewhere a starting place and a stopping place?
Q. [However] you usually you do it, [however] best you can present it.
A. Typically, when we -- in prior experiences talking to the seller or working with the bank on making a loan or a seller selling the place, we give them somewhat of a range, and the range with this particular situation I feel like somewhere between 70 and $77,000.

At the end of Mr. Hamilton's testimony, the trial judge asked some questions himself. The judge said that he was "having a hard time understanding" why Mr. Hamilton did not value the mobile home at a lesser amount due to "the national depreciation that occur[s] for mobile homes." The trial judge noted that Plaintiffs' mobile home was purchased for nearly $70,000 in 2008 and that Mr. Hamilton testified that it was worth $70,000 to $77,000 five years later. He asked Mr. Hamilton how he could explain the home "not depreciating." Mr. Hamilton said that "it has to depreciate" and that depreciation has to be counted in the equation due to the age of the home. But, Mr. Hamilton said he was provided information that the Burges made "pretty significant improvements" to the home, including porches, replacing carpet with hardwood and tile, upgraded light fixtures and ceiling fans, "and that sort of thing." He explained that such improvements can offset the amount of depreciation. The trial judge noted that the 2013 tax appraisal card listed an annual depreciation rate of 3.91% for the mobile home and asked Mr. Hamilton if that would "sound about right" to him. Mr. Hamilton said it would depend on the condition and upkeep of the mobile home, because when people take immaculate care of mobile homes, "they don't tend to depreciate much." In sum, Mr. Hamilton testified that people can improve mobile homes at a rate that exceeds depreciation and actually causes the home to appreciate in value.

After the questioning from the trial judge, counsel for Insurer asked Mr. Hamilton the following additional question:

Q. Your evaluation is as of 2015 as we sit here today?
A. No. It was 2016.
Q. So that's the day of your evaluation?
A. Uh-huh.
Q. Is that a yes?
A. Yes, sir.

This last line of questioning forms the entire basis for Insurer's argument on appeal. Insurer claims that there was "no competent proof" to support any award for the value of

the mobile home because, according to Insurer, Mr. Hamilton based his valuation on the year 2016, not the date of the fire, which was July 10, 2013. We reject this argument. As previously discussed, Mr. Hamilton was asked directly during his discussion of his opinion: "do you have an expert opinion of the value of this mobile home at the time of loss in July 2013?" He responded, "Yes, ma'am. I do." He then estimated the value at $70,000 to $77,000. Defense counsel's isolated question came after the discussion with the trial judge about other issues. The question was confusing, as it referenced "2015 as we sit here today," but the trial occurred on May 19, 2016. It also asked Mr. Hamilton about "the day of your evaluation," which could refer to the date he performed the evaluation. Given the clear testimony by Mr. Hamilton on direct examination about his "expert opinion of the value of this mobile home at the time of loss in July 2013," in addition to the abundance of valuation evidence from other witnesses and exhibits, we disagree with Insurer's argument on appeal that the record contains "no competent proof" to support any award for the mobile home.

Now, we turn to Plaintiffs' argument regarding the correct valuation. To summarize, the only three witnesses at trial who valued the mobile home estimated its value at $73,000, $75,000, and a range between $70,000 and $77,000. The trial judge found that all three witnesses were credible and that Mr. Hamilton, in particular, "was a very credible witness." The "NADA Appraisal Guides" dated May 7, 2013, just two months prior to the fire, estimated the "Total Adjusted (Retail) Value" of the home at $70,275. The 2013 tax appraisal card reviewed by Mr. Hamilton listed the "Depreciated Value" of the mobile home at $84,348. The policy limit was $69,000, but the trial judge valued the mobile home at only $65,000. The trial court found, "based on Mr. Hamilton's testimony, that mobile homes can appreciate in value if improvements and additions are made to them." The court found that the proof "was uncontroverted" that the Burges made improvements to the home each year. However, the trial court explained its finding regarding the value of the mobile home as follows:

> Based on the testimony of the witnesses, and model year of the home, depreciation, and all improvements made, the court found the value of the home to be $65,000 at the time of the loss. Included in this value were the porches and decks attached to the home.

We agree with Plaintiffs' assertion that the evidence preponderates against the trial court's finding.

The trial court apparently valued the home at such a low figure due to general notions about the concept of depreciation and a misunderstanding as to whether Mr.

Hamilton's valuation opinion was limited to 2016.[1]  However, the competent *evidence* presented at trial does not support such a low valuation.  With all of Mr. Hamilton's particular knowledge about sales of mobile homes in Grundy County and surrounding areas, he did not believe that Plaintiffs' mobile home had depreciated in value in light of the number of improvements that were made to the home.  The trial court found Mr. Hamilton "very credible."  Furthermore, even the tax card listing an annual depreciation rate of 3.91% also listed the "depreciated value" of the same mobile home at $84,348.  The record simply contains no testimony or exhibit from the trial to support an award of only $65,000 for the mobile home because of depreciation.  As such, we modify the trial court's award of $65,000 to an award of $69,000 in accordance with the policy limit.

## B.    Valuation of the Personal Property

Next, we address Insurer's argument that "there was no actual proof of the amount or value of [Plaintiffs'] personal property," and therefore, they were not entitled to any recovery for their personal property loss.  Insurer claims that "[t]he only witness who testified with regard to the value of the personal property claim, Mrs. Burge, testified that she did not know the value of her personal property loss."  Having reviewed the evidence at trial, however, we conclude that this is a gross mischaracterization of the testimony and exhibits presented.

Insurer cites to Mrs. Burge's trial testimony where she admitted that during her examination under oath after the fire, she stated that she did not know the value of her property.  In addition, Mrs. Burge was asked at trial, "As we sit here today, you don't

---

[1]During the court's oral ruling at the end of the bench trial, the judge stated:

> I had a question or two for Mr. Hamilton because the normal -- I guess the norm is that mobile homes are only depreciated and never appreciated. That is something we are taught as attorneys, and I asked him about that, and he said in some circumstances they can appreciate if certain improvements and additions have been made. Maybe an additional bedroom or something. The value of a mobile home can actually appreciate. He said that that likely took place in this case.
>
> I had a law school professor who said you can dip a mobile home in gold and you couldn't cause the value to appreciate. That's why I was asking . . . .
>
> . . . . Looking at the value of the structure, I have to subtract from something what Mr. Hamilton said because his year he testified was of 2016, so I have to subtract some when using the depreciation figures set forth in the tax card of a mobile home and looking at all of the improvements and going through the improvements, it was testified to that there were additional bedrooms put in there, hardwood flooring, new fixtures, closets and [] improvements being done every year on this property. That would be the only way that the home could have the value that it has been assessed, and it is uncontroverted that these improvements were made. There has been no proof from Farmers Mutual saying no, these improvements weren't made or any additional figures[.]

know what the value of your loss is, do you?" Mrs. Burge responded, "I do not know the actual value." However, Mrs. Burge also testified at length about the "Personal Property Inventory Loss Form" that Insurer required her to complete, and Mrs. Layne had completed a "Sworn Statement in Proof of Loss." Both documents were introduced into evidence at trial and appear in the record before us as exhibits. In the Sworn Statement in Proof of Loss, Mrs. Layne estimated that the actual cash value of the lost personal property equaled $100,000. The Personal Property Inventory Loss Form spans approximately 25 pages and contains a detailed list of around 500 entries, describing specific items of personal property that Mrs. Burge lost in the fire. It includes items of clothing, sports equipment, electronics, furniture, kitchen furnishings, appliances, and numerous other assets. The list includes each item's location in the house at the time of the fire, how it was purchased or obtained, and its estimated cost, as that information was requested by Insurer for each item. Mrs. Burge testified that all of her receipts and photographs were destroyed in the fire. However, she testified that she prepared the list from memory by visualizing each room in the home. She testified at trial about many items on the list and many types of personal property items she had in the home for her and her family. She explained that she did her best to look up the prices of items and candidly admitted that she had to guess at some costs. Mrs. Burge said she included on the list everything that she could remember and did the best that she could in compiling it. She testified that the total value of all of the items listed on the forms at the time of the fire was probably around $92,000.[2] Mrs. Layne testified that she assisted Mrs. Burge with the preparation of these lists and that they completed it to the best of their knowledge. The trial court found that Mrs. Burge and Mrs. Layne were credible witnesses and answered the questions truthfully.

Considering all this evidence, we conclude without hesitation that the trial court's award of $34,500 in accordance with the limit on personal property coverage was supported by the evidence. The assertion in Insurer's brief that the record contains "no proof of the value of the insured's personal property loss" is meritless. In fact, in Insurer's reply brief on appeal, it acknowledged the existence of Mrs. Burge's testimony that the property was worth $92,000 (after that testimony was pointed out to this Court in the appellees' brief). Insurer then argued that Mrs. Burge's testimony contradicted her statement that she did not know the value of her personal property, and therefore the two contradictory statements "cancel each other out." We disagree. Contradictory statements by the same witness regarding a single fact cancel each other and provide no evidence of the fact sought to be proven if the allegedly contradictory statements are unexplained and neither statement can be corroborated by other competent evidence. *Church v. Perales*, 39 S.W.3d 149, 169 (Tenn. Ct. App. 2000). However, Mrs. Burge's statements, viewed in context, were not irreconcilably inconsistent. She conceded that she did not know "the

---

[2]By our calculation, the total of the items listed on the personal property inventory forms exceeds $100,000.

actual value" of her personal property loss. However, she also discussed in detail the lengthy Personal Property Inventory Loss Form she completed and explained that the reason she did not know the actual costs and purchase dates was because she had lost everything -- including her home, all of her personal property, her receipts, and photographs -- in the fire. The record contains sufficient evidence to support the trial court's award of $34,500 for the personal property loss.

### C.    *Additional Living Expenses*

The insurance policy provided coverage for "Additional Living Expense" under "Coverage D" of the policy. It provided:

> We pay any necessary and reasonable increase in living expenses you incur to maintain the normal standard of living of your household if the insured premises or a portion of the insured premises is made unfit for occupancy by an insured loss. We pay only for the period of time reasonably required to make the insured premises fit for occupancy or to settle your household in new quarters, whichever is less.

At trial, Plaintiffs sought to recover the policy limit for this coverage, which was $13,800. They submitted a receipt demonstrating that the Burge family rented a home for one month before deeming it unsuitable and moving back into the home of Mr. and Mrs. Layne. The cost of the rental was $500. The trial court found that this amount was properly recoverable as additional living expenses and awarded that sum to Plaintiffs. Insurer does not challenge this award on appeal, and it is accordingly affirmed. The trial court also classified the $2,000 advance for school clothing as additional living expenses and noted that it had already been paid. Neither party challenges this ruling on appeal.

Plaintiffs sought to recover the remainder of the coverage for additional living expenses by presenting testimony that Mr. and Mrs. Layne incurred additional expenses as a result of the Burge family moving in with them. As she put it, "We went from a family of two to a family of nine." Mrs. Layne testified that she had increased electric bills, water bills, and wear and tear on appliances. She also testified that they converted their attic to a bedroom. She estimated that she incurred over $20,000 in additional costs over the two-year period that the Burges lived with her. Plaintiffs ask this Court to find that the policy also covered those expenses.

The trial judge described this as a difficult issue. He noted that Mr. and Mrs. Layne were designated as additional insureds under the policy but ultimately concluded that the "additional living expense" coverage was not intended to compensate them for the type of expenses they incurred. He concluded that the additional living expense

11

provision was intended "to compensate people who are displaced from their home and that incurred new expenses while litigation is pending." He noted that the Laynes were not displaced from their home and therefore concluded that the coverage did not apply to them. We agree with the trial court's ultimate conclusion but for slightly different reasons. The policy contained an endorsement providing that Mr. and Mrs. Layne were additional insureds under the policy, with the following language:

> The definition of insured includes the person or organization named in this endorsement with respect to:
> Coverage A - Residence,
> Coverage B - Related Private Structures on the Premises,
> Coverage L - Personal Liability, and
> Coverage M - Medical Payments to Others

It did not list Coverage D regarding "Additional Living Expense." We therefore agree with the trial court's conclusion that the policy's coverage for additional living expenses did not extend to the expenses incurred by Mr. and Mrs. Layne.[3]

### D.     The Bad Faith Penalty

As noted above, Plaintiffs reported the July 10, 2013 fire to their insurance agency the day after it occurred. Mrs. Layne testified that she made numerous attempts to contact the representative of Insurer who was assigned to the claim, but he usually would not return her phone calls, and when she was able to speak with him, he was very rude to her. The trial court found that "throughout this process the Plaintiffs have cooperated with [Insurer] and that the Plaintiffs fulfilled all their obligations by providing documents, sworn statements, and anything else required of them by the [Insurer]." Insurer did not pay Plaintiffs' claim and failed to provide any reason or explanation to Plaintiffs. Plaintiffs filed suit in July 2014. Mrs. Layne testified that she was forced to determine "what [Insurer's] objection was to paying under the policy" based on the discovery responses provided in this lawsuit in May 2015, nearly two years after the July 2013 fire occurred. Based on Insurer's discovery responses, Plaintiffs gleaned that Insurer believed they made material misrepresentations on their insurance application by failing to reveal the existence of multiple mortgages on the property. At that point, Plaintiffs sent letters and supporting documentation to Insurer in an attempt to demonstrate that there was only one mortgage on the insured property, but they never received a response.

Plaintiffs filed a motion for summary judgment in August 2015, asserting that no

---

[3]In fairness, we recognize that no one cited this particular policy language to the trial judge.

genuine issue of material fact existed regarding Insurer's defense with respect to multiple mortgages. Insurer filed a response claiming that "the insured property was encumbered by two (2) mortgages at the time the application for insurance was submitted" and that "Plaintiffs did not disclose both mortgages to [Insurer] in their application." Insurer insisted that there were "two mortgages on the subject property," including one from 2006, even though the mobile home was bought new in 2008.

The relevant documents are included in the record before us. The "Mobile-Homeowner's Application" for insurance asked for the applicant's name, the location of the property, and the "mortgage servicing company/mortgagee loan [number]" and "address." When completing the application on March 28, 2008, Mrs. Burge and Mrs. Layne provided the name and address of Citizens Tri-County Bank in Monteagle, Tennessee, as that was the entity that was in the process of financing the loan for the purchase of the mobile home. The second page asked, "Are all of the mortgagees listed on the front of this application," and the answer provided was "Yes." The amount of the mortgage was listed as $68,500, and no value or entry was listed in the spaces provided for a second or third mortgage.

Plaintiffs' loan with Citizens Tri-County Bank was completed on April 11, 2008. Aside from the lien on the mobile home, as additional collateral for the loan, Mr. and Mrs. Layne pledged as security a separate three-acre tract of real property. That property was also encumbered by a first deed of trust with Citizens Tri-County Bank that originated in 2006. This 2006 deed of trust *on the separate three-acre parcel* gave rise to Insurer's position that Plaintiffs made material misrepresentations on their application for insurance (by failing to disclose the 2006 deed of trust). We can discern no basis for such a position. The mobile homeowner's insurance application asked for the location of the property, obviously referring to the mobile home, and the "mortgage servicing company/mortgagee loan [number]" and "address," again clearly with reference to the mortgagee of the mobile home they sought to insure. The only mortgagee, Citizens Tri-County Bank, was disclosed. We find no support for Insurer's insistence that "the *insured property* [i.e., the mobile home] was encumbered by two (2) mortgages at the time the application for insurance was submitted."

Tennessee Code Annotated section 56-7-105 provides, in relevant part:

The insurance companies of this state, . . . in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest on the bond, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to

13

appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that the failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided, further, that the additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

Tenn. Code Ann. § 56-7-105(a). Basically, the statute "provides for a 25 percent penalty against an insurance company, in addition to the loss and interest, where the refusal to pay an insurance claim within 60 days is not in good faith." *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 822 (Tenn. 2003).

The statutory penalty is not recoverable in every instance when an insurance company refuses to pay a loss. *Lance v. Owner's Ins. Co.*, No. E2015-00274-COA-R3-CV, 2016 WL 3092818, at *13 (Tenn. Ct. App. May 25, 2016), *perm. app. denied* (Tenn. Oct. 20, 2016) (citing *Nelms v. Tenn. Farmers Mut. Ins. Co.*, 613 S.W.2d 481, 484 (Tenn. Ct. App. 1978)). In order to recover, the plaintiff must prove the following:

> "(1) the policy of insurance must, by its terms, have become due and payable, (2) a formal demand for payment must have been made, (3) the insured must have waited 60 days after making his demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days), and (4) the refusal to pay must not have been in good faith."

*Id.* at *12 (quoting *Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986)). An insurance company is entitled to assert available defenses and to refuse payment if "substantial legal grounds" exist indicating that the policy does not afford coverage for the loss. *Id.* If the insurer unsuccessfully asserts a defense in good faith, the imposition of the bad faith penalty is not permitted. *Id.* "[D]elay in settling a claim does not constitute bad faith when there is a genuine dispute as to value, no conscious indifference to the claim, and no proof that the insurer acted from any improper motive." *Riad v. Erie Ins. Exch.*, 436 S.W.3d 256, 270 (Tenn. Ct. App. 2013) (quoting *Palmer*, 723 S.W.2d at 126).

Whether the evidence demonstrates bad faith on the part of the insurer is a factual determination. *McColgan v. Auto-Owners Ins. Co.*, No. W2002-00114-COA-R3-CV, 2002 WL 31322538, at *4 (Tenn. Ct. App. Oct. 11, 2002); *see, e.g.*, *Gaston*, 120 S.W.3d at 822 (holding that a reasonable jury could conclude that the insurer's conduct

constituted bad faith in connection with its refusal to pay the claim). However, the imposition of a statutory penalty on an insurer is discretionary with the trial court and will not be reversed on appeal absent an abuse of discretion. *Marlin Fin. & Leasing Corp. v. Nationwide Mut. Ins. Co.*, 157 S.W.3d 796, 812-13 (Tenn. Ct. App. 2004); *Transamerica Ins. Co. v. Koonce*, C.A. No. 116, 1986 WL 5246, at *2 (Tenn. Ct. App. May 6, 1986).

In the case before us, Insurer argues that it had "substantial legal grounds" for failing to pay Plaintiffs' claim and therefore the statutory bad faith penalty was inappropriate. We disagree. A simple inquiry would have disclosed that only one mortgage encumbered the insured property, i.e., the mobile home. Insurer did not have substantial legal grounds supporting its position that Plaintiffs materially misrepresented the number of mortgages on the insured mobile home. To make matters worse, the record indicates that the Insurer compounded the problem by failing to process Plaintiffs' claim in a diligent manner. If Insurer had explained its position to Plaintiffs during the months after the fire, they could have provided any additional documents that Insurer needed in order to clarify any confusion about the mortgage. Instead, the proof presented at trial indicated that the Insurer failed to respond to Plaintiffs' calls, failed to formally deny the claim, and failed to provide an explanation for its refusal to pay until its written discovery responses after the litigation was filed and nearly two years after the fire occurred. We must therefore agree with the trial court's conclusion that Insurer's refusal to pay the loss was not in good faith. *See, e.g., Beeman v. Blue Cross/Blue Shield,* C.A. No. 59, 1988 WL 102757, at *1-3 (Tenn. Ct. App. Oct. 6, 1988) (finding bad faith when the insurer acted with "conscious indifference" toward the plaintiff's claim by failing to request appropriate information, cavalierly ignoring the true facts and plaintiff's efforts to communicate, and relying on a bald assumption even in the face of overwhelming proof to the contrary); *Estate of Wilson v. Arlington Auto Sales, Inc.*, 743 S.W.2d 923, 931-32 (Tenn. Ct. App. 1987) (affirming bad faith penalty where the most rudimentary inquiry would have revealed the necessary information and put to rest the insurer's question as to liability, as the failure to timely investigate "was a clear manifestation of [the insurer's] bad faith"); *Mason v. Tenn. Farmers Mut. Ins. Co.*, 640 S.W.2d 561, 567-68 (Tenn. Ct. App. 1982) (affirming the penalty where the insured was treated unfairly in many respects sufficient to justify the bad faith award). We disagree with Insurer's assertion that the bad faith penalty was unwarranted due to the existence of substantial legal grounds for its defense.[4]

---

[4]We note that Insurer listed a separate issue in its reply brief regarding the bad faith penalty, arguing that the trial court erred in considering Insurer's actions during the course of the litigation that allegedly demonstrated bad faith. Insurer suggests that the statute only extends to an insurer's acts of bad faith before litigation. However, we decline to consider the merits of this issue because Insurer cites no authority in support of its position and also failed to raise the issue in its initial brief on appeal. *See Sneed v. Bd. of Prof'l Responsibility of Sup.Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the

Plaintiffs argue on appeal that the trial court should have awarded the statutory maximum penalty of twenty-five percent rather than only fifteen percent. A finding that an insurance company's failure to pay was in bad faith does not automatically require a twenty-five percent penalty. *Ray v. Shelter Ins. Companies*, No. 01A01-9208-CV-00324, 1993 WL 15151, at *2 (Tenn. Ct. App. Jan. 27, 1993). "The bad faith penalty statute allows for recovery of an amount *up to* twenty-five percent of the amount of loss[.]" *McColgan*, 2002 WL 31322538, at *5 (quoting Tenn. Code Ann. § 56-7-105). The statute provides that "the additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed." Tenn. Code Ann. § 56-7-105(a). In other words, "[t]his so-called penalty is not simply a punitive award but allows for the recovery of the additional damages caused by a breach of the insurance policy." *McColgan*, 2002 WL 31322538, at *5. The burden is on the plaintiff to show the additional expense, loss, or injury. *Id.*; *Ray*, 1993 WL 15151, at *2.

When announcing his oral ruling regarding the amount of the statutory penalty, the trial judge noted that Plaintiffs had incurred around $16,000 in attorney's fees. The statutory penalty of fifteen percent equated to an award of $15,300. We find no abuse of discretion in the trial court's ruling.

### E. Remaining Issues

Plaintiffs seek an award of attorney's fees on appeal and post-judgment interest. Plaintiffs cited no basis for an award of attorney's fees on appeal, and their request is respectfully denied. "Postjudgment interest, on the other hand, is mandatory pursuant to Tennessee Code Annotated § 47-14-122." *Raines Bros., Inc. v. Chitwood*, No. E2015-01430-COA-R3-CV, 2016 WL 3090902, at *4 (Tenn. Ct. App. May 24, 2016) (*no perm. app. filed*) (citing *Vooys v. Turner*, 49 S.W.3d 318, 321 (Tenn. Ct. App. 2001)). The statute provides:

> Interest shall be computed on every judgment from the day on which the jury or the court, sitting without a jury, returned the verdict without regard to a motion for a new trial.

Tenn. Code Ann. § 47-14-122. "The failure of a trial court's judgment or decree to specify post-judgment interest does not abrogate the obligation imposed by the statute."

---

courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."); *Owens v. Owens*, 241 S.W.3d 478, 499 (Tenn. Ct. App. 2007) ("A reply brief is a response to the arguments of the appellee. It is not a vehicle for raising new issues.").

*State v. Thompson*, 197 S.W.3d 685, 693 (Tenn. 2006) (citation omitted). The trial court may address any unresolved issues regarding the calculation of post-judgment interest on remand if necessary.

## V. CONCLUSION

For the aforementioned reasons, the decision of the circuit court is hereby affirmed as modified and remanded for further proceedings. Costs of this appeal are taxed to the appellant, Farmers Mutual of Tennessee, and their surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE